### TWEEDIE TRADING CO. v. JAMES P. McDONALD CO.

### JAMES P. McDONALD CO. v. TWEEDIE TRADING CO.

(District Court, S. D. New York.   March 29, 1902.)

CONTRACT—IMPOSSIBILITY OF PERFORMANCE—ACTS OF FOREIGN GOVERNMENT.
    Libelant and defendant entered into a contract in the United States by which libelant agreed to make four trips with its steamship from Barbadoes to Colon, to transport laborers for defendant, which contracted to pay a stated sum for each trip. The contract, when made, was legal and valid where made, and also at the places of performance; but after two trips had been made a regulation of the colonial government of Barbadoes was promulgated forbidding the future embarkation of laborers, by reason of which defendant was unable to furnish any more for transportation. *Held*, that such fact, which did not affect the legality of the contract where made, did not constitute a defense to an action to recover the hire of the ship for the remaining voyages at the contract price.

In Admiralty. Action for breach of contract, and cross action to recover money paid thereunder.

Wheeler & Cortis, for the Tweedie Company.

Cary & Whitridge, for the McDonald Company.

ADAMS, District Judge. The first of these actions is for the recovery of $8,400 as damages for breach of contract to furnish certain laborers to be carried from Barbadoes to Colon on the last of four consecutive trips, and for $731.62 demurrage at Colon. The second action is for the recovery back of $8,400, the amount paid in advance by the McDonald Company to the Tweedie Company to carry laborers by the third trip, for which it is claimed no services were rendered.

The controversies arose out of a contract made between the parties on the 23d day of April, 1901, the material parts of which are as follows:

"Second. The contractors hereby contract for the passage of about twenty-eight hundred (2,800) laborers to be taken from some safe port in Barbadoes where the steamer can always lie safely afloat, by the steamer Catania, to Colon; to be carried on four consecutive trips, with a minimum of seven hundred (700) passengers upon each trip."

"Sixth. The contractors shall be allowed a total period of twenty-four (24) hours at all ports in which to embark the laborers, at one or more ports of embarkation, on each trip; and at the port of destination the laborers are to go ashore, on arrival, in such manner as the authorities may direct."

"Ninth. The time allowed for debarkation shall be six hours after the arrival of the vessel at dock, or twenty-four hours after arrival if landed by lighters. The contractors shall not be liable for any demurrage which may be caused at any port of embarkation or destination after notification given to the agent, or after the arrival of the steamship at the port of embarkation, by reason of the fact that the condition of the sea may be such that the laborers can neither be embarked or disembarked, or by reason of the fact that the local authorities may fail to deliver to the contractors the necessary permits for embarkation or debarkation.

"Tenth. In full payment for the services so to be rendered, the contractors will pay the carrier eighty-four hundred dollars ($8,400) per trip, and at the rate of twelve dollars ($12) per capita for any excess over seven hundred (700) laborers carried, if the contractors desire to ship in excess of that number, and the carrier is lawfully empowered to carry such excess; such payment by the contractors to cover all charges whatsoever.

"Eleventh. Payments are to be made as follows: Eighty-four hundred dollars ($8,400) upon the arrival of the Catania at Colon on her present trip, and eighty-four hundred dollars ($8,400) upon her arrival at Barbadoes on each trip thereafter, until four trips have been paid for; the final service to be rendered without further payment, except for such laborers in excess of seven hundred (700) as may be carried upon any such trips. All payments to be made by the contractors at the office of the carrier in New York, on notification to the contractors by the carrier that the steamer has arrived at Colon or Barbadoes, as the case may be, and is in readiness to embark laborers.

"Twelfth. Demurrage, if any is incurred under this contract, shall be fifty (50) pounds British sterling for each day or fraction thereof.

"Thirteenth. The contractors are not to be liable for any expense for port, dock, navigation, or landing charges; and the contractors agree to hold the carrier free from any capitation or other tax upon the exportation or importation of laborers."

"Fifteenth. The carrier is to obtain any certificates or authority required by the law of Barbadoes in relation to the carriage of laborers or otherwise to fulfill the obligations of the carrier under this agreement."

"Seventeenth. Should the steamer at any time be quarantined at Barbadoes, the contractors, when notified that steamer is ready to receive them there, are to send the laborers out to the quarantine station, and there put them on board the steamer, thus avoiding any detention in quarantine; and for any such detention in quarantine over the agreed lay days, contractors to pay demurrage."

The facts in the case have been agreed upon in writing as follows:

"First. The Tweedie Trading Company (hereinafter called the 'Tweedie Company') is a New Jersey corporation, with an office in New York City.

"Second. The James P. McDonald Company (hereinafter called the 'McDonald Company') is a West Virginia corporation, with an office in New York City.

"Third. The Tweedie Company entered into an agreement with the McDonald Company, on the 23d day of April, 1901, at New York City, of which a copy is annexed to the pleadings.

"Fourth. At the time this agreement was entered into, the Catania, the vessel therein mentioned, was on the way from Puerto Rico to Colon, on the second of four intended consecutive trips, under an agreement between the same parties of earlier date, which was superseded and rescinded by the agreement of April 23d, as set forth in the recital of the said agreement.

"Fifth. The Catania sailed from Colon on the first voyage, under said agreement of April 23d, on April 25, 1901, and arrived at Bridgetown, Barbadoes, on the 3d day of May. According to the terms of the contract, the first payment of $8,400 was made by the McDonald Company, at New York.

on April 26th, on being informed by the Tweedie Trading Company that the vessel had started on said first voyage; and the second payment of $8,400 was likewise made on the 4th day of May, at New York, by the McDonald Company, on being informed by the Tweedie Company that the vessel had arrived at Barbadoes.

"Sixth. On arriving at Barbadoes, the captain at once sent a registered letter to the McDonald Company agent, informing him of the arrival of the vessel, and a note by messenger to the same effect, which reached him about 11 o'clock on May 3d. The Catania sailed at 6:30 a. m. on May 8th, and arrived at Colon on May 14th at about 11:30 a. m., and all passengers were disembarked at 2 p. m. of the same day. A copy of the statement of the McDonald Company's agent, dated May 7, 1901, is annexed and marked 'Exhibit 1.'

"Seventh. The vessel started from Colon on her second trip at about 11 a. m. on May 16th, having been delayed by lack of orders from McDonald Company, and reached the Barbadoes at about 1:30 p. m. on May 23d. The captain of the Catania served notice of his arrival on the McDonald Company's agent that afternoon, and at five o'clock on the following day, May 24th, the vessel started on its return trip to Colon. The third payment of $8,-400 was made on May 23d. at New York, by the McDonald Company, according to the contract, on notice that the vessel had arrived at the Barbadoes the second time. The Catania arrived at Colon at 6:35 in the evening of May 30th, and at once reported on shore that she was ready to unload. The McDonald agent, however, was not then at Colon. The Panama Railroad Company refused to allow the vessel to unload until the McDonald Company agent had arrived. He came to Colon as soon as possible, and reached there at eleven o'clock on May 31st, and at 2 o'clock on that day the passengers were all unloaded.

"Eighth. In the meantime a regulation of the colonial authorities in Barbadoes, acting under instructions of the foreign office of the British government, had been put in force, by which the British foreign office had forbidden future embarkation of laborers from the Barbadoes, by a decree published in the Barbadoes on the 24th day of May, before the sailing of the Catania; such decree to take effect on the following day. This decree was known to the captain of the Catania and to the McDonald Company agent, and materially hastened the sailing of the vessel, which went off on its second voyage with only 73 passengers. The agent of the McDonald Company did everything in his power to obtain a reversal of this decree, but was unsuccessful, and on the 31st day of May the order was confirmed and reaffirmed by a second telegram from the foreign office of Great Britain to the colonial authorities of the Barbadoes. The regulation is still in force in Barbadoes.

"Ninth. The McDonald Company agent cabled its New York office on the 31st day of May that the enactment of the above regulation had been confirmed, whereupon the McDonald Company on the same day wrote the Tweedie Company that the above-mentioned embargo had been confirmed. This notice was read over the telephone to the Tweedie Company, and then mailed to them, and was received on the 1st of June. Later a demand was made that the third payment of $8,400 be returned.

"Tenth. The Catania remained at Colon until June 4th. She then proceeded to the Barbadoes, by order of the Tweedie Trading Company, where she arrived on June 12th, and gave the regular notice of arrival to the McDonald Company's agent. The Catania remained at Barbadoes until July 12th, when the vessel sailed to Puerto Rico to take on board a load of sugar for New York, after having notified the McDonald Company, in New York, that she was about to do so.

"Eleventh. No objection was ever made by the colonial authorities to the use of the Catania for carrying passengers on the ground of the vessel's lack of fitness for that purpose. Acting upon the letter of May 31, 1901, from Messrs. Cary & Whitridge, requiring the Tweedie Trading Company to provide the certificate 'required by the law of Barbadoes in relation to the carriage of laborers,' the latter company cabled the captain of the Catania to obtain such a certificate. Application was made for the same, and the cap-

tain informed that no such certificates were given, and a certified copy of an extract of the Barbadoes passenger act (1891) was furnished by the authorities. Said extract is annexed, marked 'T, Ex. 12.'

"Twelfth. The right is reserved to both parties to put in formal proof of the reason for the enactment of the British regulation above mentioned, provided a resubmission of the case with this additional evidence is desired by the Tweedie Trading Company. Should the court require any additional facts for a proper determination of the rights of the parties, they shall be stipulated, or, if not agreed upon, proved by evidence in the ordinary way.

"Thirteenth. Copies of correspondence are annexed, and admitted correct.

"Fourteenth. The British law, which is also the law of Barbadoes, is a fact in the case, which may be proved by reference to reports, and the submission of briefs by counsel.

The exhibits and correspondence alluded to in the agreement, where relevant, and the facts shown by them are not covered by the agreement, bear principally upon the question of demurrage; and it is not necessary to further allude to them in connection with the principal question, which is whether the facts in the case excuse performance on the part of the McDonald Company.

The contract was valid in its inception, both at the place of making and the place of performance, and was capable of being performed until an event intervened which was not in the contemplation of the parties when the contract was made. It seems to be settled that an impossibility of performance, arising from natural causes, in a case of this kind, cannot be recognized as a defense, but that one arising from a governmental act which would render performance illegal would be an excuse. It is contended here by the Tweedie Company, however, that the excuse cannot prevail, because, though performance was prevented by the law, such law, being foreign, was merely a fact, and the case should for that reason fall within the general rule. On the other hand, it is urged by the McDonald Company that the law of the place of performance governed the contract, and, as such law made fulfillment impossible, the contract was dissolved. The question really is, do the legal acts of the agents of a foreign government, which prevent the full performance of a contract of this character, control the rights of the parties? Contracting parties are subject to the contingencies of changes in their own law, and liable to have the execution of their contracts prevented thereby; but it is on the ground of illegality, not of impossibility. Prevention by the law of a foreign country is not usually deemed an excuse, when the act which was contemplated by the contract was valid in view of the law of the place where it was made,—Pol. Cont. 363; Abb. Shipp. (13th London Ed.) 755; Carv. Carr. by Sea (3d Ed.) § 255; Clifford v. Watts, L. R. 5 C. P. 577, 586; Duff v. Lawrence, 3 Johns. Cas. 162, 172; Spence v. Chadwick, 10 Q. B. 517, 530; Jacobs v. Credit Lyonnais, 12 Q. B. Div. 589,—and a fortiori when it was also then valid at the place of performance. It was intended that this contract should be performed. The law of the place of performance, in the absence of evidence of a contrary intention, ordinarily governs the incidents of a performance; but I do not think that the principle can be successfully invoked to relieve a party, otherwise liable, from the effect of such an interruption of performance as happened here. The McDonald Company urges that, by the terms of the contract,—referring to the ninth and fifteenth claus-

es,—the parties had the Barbadoes law in view, and that it should control in all respects. It is evident that the existing law there was in view so far as it affected the performance of the contract in the necessity for the obtainment by the vessel of the mentioned permits and certificates, but those clauses do not tend to establish that the parties intended that the shipowner should take the risk of a change in the law which would prevent any embarkation or carriage of the laborers whatever. The difficulty did not arise from the absence of the permits and certificates, which would, in the ordinary course, have been obtained by the steamer, if necessary.

The determination of the question involved adversely to the McDonald Company disposes of its claim for a return of the third payment.

It appears that some demurrage is due to the Tweedie Company by reason of the default of the McDonald Company to give the vessel the dispatch it was entitled to at Colon.

Decree for the Tweedie Company, with a reference to ascertain the amount of damages and demurrage. The libel of the McDonald Company is dismissed.