## CENTRAL HANOVER BANK & TRUST CO. v. SIEMENS & HALSKE AKTIEN-GESELLSCHAFT et al.

District Court, S. D. New York.

April 15, 1936.

928

Larkin, Rathbone & Perry, of New York City, for plaintiff.

Cravath, de Gersdorff, Swaine & Wood, of New York City, for defendants.

### PATTERSON, District Judge.

The motion is by the plaintiff for partial summary judgment under rule 114 of the New York Rules of Civil Practice. The plaintiff is trustee for bondholders under a trust indenture securing bonds issued by the defendants, corporations under the laws of Germany. It seeks to recover judgment at law for the principal, premium, and interest on bonds now overdue and unpaid. By concession of the defendants, the amounts overdue and unpaid are $964,500 in principal, $19,290 in premium, and certain amounts of interest. The defendants' points are that certain recent laws of the German government justify nonpayment, and that in any event the plaintiff, not being a bondholder, is entitled to recover no more than nominal damages. The facts are undisputed.

The defendants, as already mentioned, are corporations organized under the laws of Germany. In 1925 they issued and sold in this country $10,000,000 bonds known as their secured sinking fund gold bonds; $5,000,000 due January 1, 1928, and $5,000,000 due January 1, 1935. The $964,500 bonds still unpaid are of the maturity of January 1, 1935. The bonds called for payment at the office of Dillon Read & Co. in New York City, in gold coin of the United States. The bonds on their face made reference to a trust indenture between the defendants and the plaintiff as trustee, for a description of the rights of the holders, the trustee and the obligors. The bonds also carried a clause to the effect that except as otherwise provided in the trust indenture all rights of action on the bonds and coupons were "vested exclusively in the trustee."

By the trust indenture certain commodities were put up as collateral security for payment of the bonds. The trust indenture contained these provisions bearing on the matters now in controversy: (1) The bonds should not be valid until authenticated by the trustee; (2) the obligors were to maintain an office or agency in New York City for the payment of principal, premium, and interest on the bonds, as well as an office here for registry, transfer, and exchange of bonds; (3) the obligors subjected themselves to the jurisdiction of the United States courts and of the New York courts as to all actions on the bonds, appointing an agent here to take the service of process, with the same effect as if the obligors existed here and were inhabitants of this district; (4) on default the trustee might proceed with a suit at law to enforce payment of the bonds; (5) on commencement of any suit to obtain judgment for principal and interest on the bonds, the obligors would waive service of process, enter voluntary appearance, and consent to entry of judgment "for such principal and premium and interest, * * * and for the lawful costs and the expenses and compensation of the Trustee and of the Trustee's agent, and for such other relief as the Trustee may be entitled to hereunder"; (6) no bondholder might commence suit to collect on any bond unless he had given written notice of default and had tendered adequate security to the trustee against expenses of suit, and unless also a majority of the bondholders had requested the trustee to take action and the trustee had "declined or failed to take such action." The indenture recited that it was executed and delivered in New York City.

The German laws pleaded as a defense are certain acts passed in 1933 and 1935. They are to the effect that debts owed by Germans to foreigners shall be paid by the debtors to the German government; that on such payment the obligations of the debtors to the foreign creditors shall be extinguished; that the government will issue certificates of indebtedness to the foreign creditors; and that foreign exchange cannot be disposed of without approval of the government. It is shown that the de-

fendants requested permission of the German government to pay these bonds on the due date, and that permission was refused.

First, as to the defense based on the German laws. Judge Learned Hand recently said that "by the law of most civilized countries the legality of the performance of a contract depends upon the law of the place of performance, and a contract is enforceable, if lawful by the law of the place of making when made, and if the performance is lawful by the law of the place of performance when due." Anglo-Continentale Treuhand v. St. Louis Southwestern Ry. Co., 81 F.(2d) 11, 12 (C. C.A.2), certiorari denied April 6, 1936, Henwood v. Anglo-Continentale Treuhand, 56 S.Ct. 675, 80 L.Ed. ——. In that case it was held that a contract by an American corporation to pay in guilders abroad was not affected by our domestic monetary resolution of June 5, 1933. By the same token a contract made here by a German corporation to pay money here is not touched by a law of Germany prohibiting such payment or purporting to discharge the debtor altogether on payment to the German government.

It is the law of the place of performance that controls matters relative to legality of performance, impossibility of performance, and other excuses for nonperformance. New York Life Ins. Co. v. Dodge, 246 U.S. 357, 38 S.Ct. 337, 62 L. Ed. 772, Ann.Cas.1918E, 593; Zimmermann v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034; Louis-Dreyfus v. Paterson Steamships, 43 F.(2d) 824, 72 A.L.R. 242 (C.C.A.2); Ralli Bros. v. Compania Naviera, [1920] 2 K.B. 287; Beale on Conflict of Laws, §§ 355–372. The impossibility, illegality, or excuse relied on here is impossibility, illegality, or excuse by German law. But as the contracts were made here and were to be performed here, the German law relative to performance is of no legal significance in the courts of this country. By our law the bonds were valid when issued; by our law there is no impossibility, illegality, or other excuse for nonperformance, beyond the fact that payment in gold coin is dispensed with.

The argument is made that impossibility of performance created by foreign law is coming to be recognized both here and in England as a form of impossibility in fact and consequently as a defense to an action for breach of contract. The rule has frequently been laid down that impossibility due to change in foreign law is no excuse for breach of contract. Tweedie Trading Co. v. James P. McDonald Co., 114 F. 985 (D.C.N.Y.); Richards & Co. v. Wreschner, 174 App.Div. 484, 156 N.Y.S. 1054, 158 N.Y.S. 1129; Krulewitch v. National Importing & Trading Co., 195 App. Div. 544, 186 N.Y.S. 838; Jacobs v. Credit Lyonnais, 12 Q.B.Div. 589; Ashmore v. Cox, [1899] 1 Q.B. 436. Williston criticizes the rule as applied in cases where the change in foreign law has destroyed the means of performance fixed by the contract or the means of performance contemplated by the parties. Williston on Contracts, §§ 1938, 1951–1953. See, also, Earn Line S. S. Co. v. Sutherland S. S. Co., 254 F. 126 (D.C.N.Y.). But the Williston rule does not aid these defendants. The German laws certainly did not destroy any means of performance fixed by the contract. The defendants' engagement was to pay in New York, and it was not provided in the contract that the funds for payment were to be sent here from Germany. It may not even be maintained that the German laws destroyed the means of performance contemplated by the parties. For all that the bondholders knew or cared when they bought the bonds, the funds wherewith the defendants would pay the bonds might come from deposits maintained by the defendants in countries other than Germany or from business done outside of Germany. Over and above these matters, however, is the fact that the bondholders paid their money down and the defendants had the full benefit of it. The contract was wholly executed on the bondholders' part. Even if the defendants' further performance of their promise to pay were impossible in the eye of the law, the defendants would still be liable to repay what they had borrowed. "The performance of one who has merely contracted to pay money will not generally become excusably impossible; but this may happen when a partly performed contract is forbidden by supervening change of law. Money previously paid in such a case, for which no return has been received, should be recoverable." Williston on Contracts, § 1972. From every point of view, therefore, there is no substance in the argument that the defendants have been discharged by impossibility under the laws of Germany.

The defendants look for comfort to Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020. There

a Canadian railroad company issued bonds in Canada which were payable here. The company later became insolvent and was reorganized under a Canadian statute providing for the issuance of new bonds in place of the old. The great majority of bondholders assented to the reorganization. Several nonassenting bondholders brought suit here on their old bonds. The Supreme Court held that the scheme of reorganization was a type of composition or bankruptcy frequently availed of in England and Canada before the bonds in question had been issued, and that bondholders in the United States as well as those in Canada were bound by the reorganization. Whether the result is consistent with the many cases to the effect that foreign creditors who stay aloof are not bound by a debtor's discharge for insolvency under the laws of his own state is not for me to say. The rule of the Gebhard Case certainly does not extend to the present situation, where the German law invoked by the defendants is not an insolvency law applicable alike to all creditors but is rather a law that discriminates against nonresident creditors. It is safe to say that the Gebhard Case would not have been decided as it was if the Canadian reorganization had provided that one treatment should be given to Canadian creditors and another and less favorable one to all other creditors.

It is true that in the Gebhard Case broad language was used as to the extent to which creditors of foreign corporations submit themselves to the laws of the foreign government. But even in the broadest passages the submission was said to be to "such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes." 109 U.S. 527, at page 537, 3 S.Ct. 363, 370, 27 L.Ed. 1020. It certainly will not be claimed in this case that in 1925 there was a "known and established policy" of the German government to prohibit German corporations from paying their debts to creditors abroad.

The defense based on the German laws of 1933 and 1935 is insufficient. The same result has been reached in a line of cases in the New York courts at nisi prius. Perry v. Norddeutscher Lloyd, 150 Misc. 73, 268 N.Y.S. 525; Sheppard v. Hamburg-Amerikanische Packet-Fahrt-actien-Gesellschaft, New York Law Journal, March 14, 1934; Glynn v. United Steel Works Corporation, 160 Misc. 405, 289 N.Y.S. 1037.

Second, as to the defense that the plaintiff as trustee for bondholders cannot recover more than nominal damages; that the real right of action on these bonds is vested in the bondholders as a body.

In a state of nature it would be rational to expect that suit on bonds would be brought by bondholders, and that suit to enforce the security would be brought by the trustee. But such a primitive condition has practically ceased to exist with large issues of bonds. As a rule, corporation bonds and accompanying indentures now carry provisions whose purpose, perhaps a laudable one, is to clog the right of bondholders to bring suit on the bonds and to transfer such right in large measure to the trustee.

The bonds and trust indenture involved in this case are of the type now fashionable. A review of their provisions makes it evident that on default by the obligors it was the trustee that should bring suit on the bonds; that the bondholders might sue on the bonds only under the most limited conditions. The bonds themselves gave plain notice to whoever took them that all rights of action on the bonds were "vested exclusively in the trustee," except as otherwise provided in the indenture. The only provision "otherwise" in the indenture was that a bondholder might sue on a bond provided he had first tendered security to the trustee and provided also that despite request to sue by holders of more than 50 per cent. of the bonds the trustee "declined or failed" to bring suit. The last provision itself is indicative of the right of the trustee to bring suit on the bonds. These provisions force the defendants to retreat to the position that the trustee has only a "naked right" to bring suit on the bonds, a right to recover only nominal damages. But there are other provisions in the indenture that force the defendants out of that position as well. It is provided that on default the trustee may sue at law to enforce payment of the bonds, and that on commencement of any action "to obtain judgment for the principal of and premium on, or interest on, the bonds, or for both," the defendants would consent to entry of judgment for principal, premium, interest, costs, expenses, and compensation of the trustee, "and for such other relief as the

trustee may be entitled to hereunder." This is a plain covenant that on suit by the trustee on the bonds the defendants would be liable for the full amount due and unpaid. The trustee will of course hold any proceeds recovered in trust for the bondholders, which is no more and no less than is the case wherever a trustee recovers money on a claim held in trust for others. In face of these provisions it is vain for the defendants to say that it was not the intention that the trustee should recover substantial damages.

The cases relied on by the defendants, Mackay v. Randolph Macon Coal Co., 178 F. 881 (C.C.A.8), In re A. J. Ellis, Inc., 242 F. 156 (D.C.N.J.), and Fitkin v. Century Oil Co. (C.C.A.) 16 F.(2d) 22, are beside the mark. In all of them the primary right to bring suit on the bonds remained with the bondholders and was not passed over to the trustee. In the Fitkin Case, for example, the provision in the indenture was that on default the trustee might bring suit to enforce its rights "under this indenture." Clearly, then, the only suits that could be brought by the trustee were suits in reference to the mortgaged property, and so it was held that the trustee could not sue directly on the bonds or file claim based on them. The present case, on the other hand, resembles In re United Cigar Stores Co., Inc., 68 F.(2d) 895 (C.C.A.2), and In re International Match Corp., 3 F.Supp. 445 (D.C.N.Y.), where the right of the trustee to file proof of claim in bankruptcy proceedings against the obligor was sustained. It also resembles several cases in which bondholders were held to have no right to maintain action on the bonds; the ground being that under the particular bonds and indentures the sole right of action on the bonds was in the trustee. Crosthwaite v. Moline Plow Co., 298 F. 466 (D.C.N.Y.); Allan v. Moline Plow Co., 14 F.(2d) 912 (C.C.A.8); Lidgerwood v. Hale & Kilburn Corporation, 47 F.(2d) 318 (D.C.N.Y.).

The defenses relied on are altogether without merit. On the undisputed facts the plaintiff is entitled to partial summary judgment. It will have judgment for $964,500 in principal amount due and unpaid, and $19,290 in premium due and unpaid, as well as for the unpaid interest on the bonds. The action may be continued as to the other sums alleged to be due. The order will be settled on two days' notice.