## MAYER v. HUNGARIAN COMMERCIAL BANK OF PEST et al.

### No. 7424.

District Court, E. D. New York.

July 28, 1937.

Emanuel Celler, of New York City (Murray C. Spett, of New York City, of counsel), for plaintiff.

Debevoise, Stevenson, Plimpton & Page, of New York City (Francis T. Plimpton, D. F. McGlinchey, and Carl McGowan, all of New York City, of counsel), for defendant Hungarian Commercial Bank of Pest.

Reynolds, Richards & McCutcheon, of New York City (George H. Richards, Richard C. Berresford, and John B. Gates, all of New York City, of counsel), for defendant National Bank of Hungary.

GALSTON, District Judge.

Both defendants appear specially in support of motions to set aside warrants of attachment and orders directing service by publication.

The action was commenced in the Supreme Court, Kings county, state of New York, by a resident and citizen of New York, as the alleged holder of certain bonds of the Hungarian Consolidated Municipal Loans of 1925 and 1926, to recover damages from the two defendant banks. An application for a warrant of attachment was granted December 18, 1936, and funds of both defendants on deposit in banks in the county of New York were attached thereunder. Thereafter an order for the service of summons on the defendants by publication was made on January 12, 1937, and publication so ordered was commenced on January 14, 1937. The case was duly removed to this court on April 8, 1937.

The plaintiff seeks to recover the sum of $33,880 for damages for breaches of express contracts. In the first cause of action he alleges that on July 11, 1925, the government of the Kingdom of Hungary, acting on behalf of certain cities of that nation, entered into a contract with Speyer & Co. of New York, wherein the bankers underwrote an issue of bonds called the Hungarian Consolidated Municipal Loan 20-year 7½ per cent. secured sinking fund gold (coupon) bonds, in the sum of $10,000,000. It is alleged that pursuant to said agreement the cities entered into agreement with the defendant Hungarian Commercial Bank of Pest, whereby Speyer & Co.[1] appointed said defendant trustee of the loan, and the cities requested and the Hungarian Commercial Bank of Pest agreed to perform certain duties which in the main were to deduct, from the amounts paid into a special account with the other defendant, the National Bank of Hungary, and immediately to place at the disposal of the bankers, the sum of $486,595 each ensuing half yearly period of the loan, and to remit any balance to the said cities. It is alleged that the Commercial Bank agreed to and did give a standing order to the National Bank of Hungary for such balance to be remitted and the National Bank of Hungary agreed to carry out such order. It is further alleged that money so placed at the disposal of the bankers as fiscal agents should be remitted by the defendants to the bankers in New York in dollars to the full amount of said semiannual sums.

Bonds in the form described in the agreement were issued and delivered to the bankers. It is alleged that the bankers sold the bonds to the general public and that the bonds were actively traded in on the New York Stock Exchange. Plaintiff alleges that he is the owner of 39 of said bonds of the par value of $39,000.

Continuing, the plaintiff alleges that the Hungarian government, on behalf of the cities, deposited with the National Bank of Hungary, to the credit of the Commercial Bank as trustee under the agreement referred to, the whole or substantial portions of the sums required by the agreement, but that after January 1, 1932, the Commercial Bank in breach of the trust and in violation of the terms and conditions "of said loan agreement," and with the advice, approval and "at the command of the defendant National Bank of Hungary," failed to require that the obligations of the contract and bonds be fully performed; failed

---

[1] See paragraph "Fifth" of the complaint.

to require that the pledged revenues be duly paid and disposed of as specified in the contract and bonds; permitted a default in the payment; failed to give 30 days' notice to the Royal Hungarian government with respect to their defaults, and especially failed to place at the disposal of the bankers money in respect to a half year service of said loan, and diverted the funds on deposit with the National Bank of Hungary, and that as a result "the holders of all the bonds were unable to collect, either in gold or the equivalent thereof * * * the full amount of the coupons due * * * as a result whereof the security of the bonds became impaired." It is then alleged that the market value was affected and at the time the complaint was executed the bonds were quoted upon the New York Stock Exchange at $230 for each $1,000 bond. Plaintiff claims that the alleged breach and violation of the agreement resulted in damage to him of $30,030.

A second cause of action is in all respects substantially similar in principle to that set forth in the first cause of action and relates to an issue of bonds of 20-year 7 per cent. secured sinking fund bonds in the aggregate principle sum of $6,000,000. Plaintiff alleges that he is the owner of five of said bonds of the par value of $5,000, and that the market value, as a result of the breaches, is only $230 per $1,000 bond, and accordingly he has been damaged in the sum of $3,850.

The defendants contend that the plaintiff has failed to make out a cause of action specified in section 902 of the Civil Practice Act and that accordingly a warrant of attachment should not have issued.

Section 902 reads as follows:

"In what actions attachment of property may be had. A warrant of attachment against the property of one or more defendants in an action may be granted upon the application of the plaintiff, as specified in the next section, where the action is to recover a sum of money only, as a tax or as damages for one or more of the following causes:

"1. Breach of contract, express or implied, other than a contract to marry.

"2. Wrongful conversion of personal property.

"3. An injury to person or property in consequence of negligence, fraud or other wrongful act.

"4. A wrongful act, neglect or default by which the decedent's death was caused, when the cause of action arose in this state before or after the passage of this act and the action is brought by an executor or administrator against a natural person who, or a corporation which, would have been liable to an action in favor of the decedent by reason thereof if death had not ensued."

The affidavit of the plaintiff supporting the application for a warrant of attachment avers that the damages referred to in the complaint are sought for breaches of express contracts. Accordingly the plaintiff must stand or fall on that showing. Zenith Bathing Pavilion, Inc. v. Fair Oak Steamship Corporation, 240 N.Y. 307, 148 N.E. 532.

What contract, if any, exists between the plaintiff and the defendants or either of them? No direct contract is, of course, alleged. The plaintiff is a holder of bonds. These bonds recite that they are the direct obligations of the municipalities and are payable at the office of Speyer & Co., fiscal agents of the loan in the city of New York. It is stated that the municipalities, in conjunction with Speyer & Co., appointed the Hungarian Commercial Bank of Pest as trustee for the loan, and that the trustee has accepted the appointment and has agreed to fulfill among others the following duties:

"(a) Require that the obligations in the contract under which the Bonds are issued and in the Bonds, undertaken by the Government in its own name and on its own behalf and on behalf of the municipalities, are duly fulfilled.

"(b) Require that the pledged revenues hereinbefore specifically enumerated are duly paid in and disposed of in such a manner as is specified in said contract and in the Bonds and that a certificate signed by a duly authorized official of the Ministry of Finance shall be delivered to the Trustee every three months stating the amount of the specific revenues from the income tax on profits and from the turnover tax as described above, collected in each municipality during the past period of three months and stating the amounts which have been paid into the Trustee's account on behalf of each municipality.

"(c) Open an account in its name as Trustee with the National Bank of Hungary for the reception of the pledged revenues or other monies to which the Trustee may be entitled under the terms of the contract and accept such receipts of monies and make such payments of monies as may

be necessary under the terms of the contract.

"(d) The Trustee shall satisfy himself that the proceeds of this Loan are utilized for expenditure for purposes for which the Bonds were issued and the Trustee shall be entitled to the production of the necessary evidence in support of such expenditure."

The bond further recites: "The service of the loan * * '* is secured by a first direct charge in favor of the trustee on all the revenues of the municipalities * * * being collected by the government in its own name on its own behalf and being paid monthly into the aforementioned account in the name of the trustee in the National Bank of Hungary."

Another provision is: "The municipalities have requested the trustee and the trustee has agreed to undertake * * * to deduct from the amounts paid into the trustee's special account and to immediately place at the absolute disposal of the fiscal agents the sum of $486,595 * * * in respect to each ensuing half yearly service of the loan. * * * The monies so placed at the disposal of the fiscal agents shall be remitted by the trustee monthly to the fiscal agents in New York in dollars, the full amount of each such semi-annual sum to be in their hands before the next ensuing interest payment date."

The agreement between the municipalities and the Commercial Bank does not accompany the papers, nor is there a copy of any agreement set forth between the municipalities and the Hungarian National Bank, or indeed between the Commercial Bank and the Hungarian National Bank. Stated succinctly, what the plaintiff complains of is that the Commercial Bank was obligated to direct the National Bank to transmit funds to Speyer in New York and that on and after January 1, 1932, it failed to do so; and that its breach was effected "with the advice, approval and at the command" of the National Bank.

■ It is the contention of the plaintiff that the bankers acted as agent for the bondholders and that each bondholder was an individual principal of the bankers and entitled to the rights arising from the contract entered into with the Commercial Bank.

That contention is unsound, for Speyer & Co., the bankers, were the agents not of the bondholders but of the municipalities. Staten Island Cricket & Baseball Club v. Farmers' Loan & Trust Co., 41 App.Div. 321, 58 N.Y.S. 460; Gledhill v. Schiff, 224 N.Y. 593, 120 N.E. 863; Erb v. Banco di Napoli, 243 N.Y. 45, 152 N.E. 460, 50 A. L.R. 1009.

It is difficult to understand always what contract is asserted to have been breached. From the brief it would appear that as against the defendant Commercial Bank it is the contract between the Commercial Bank and the municipalities. But that contract is not before us and we are left to spell out its obligations from the duties which the trustees are stated to have assumed as set forth in the agreement of the cities with Speyer & Co.

■ Another theory of the plaintiff is that the "agreement" (again it is not clear which is referred to) was for the payment to bondholders and for their benefit, and plaintiff relies upon Lawrence v. Fox, 20 N.Y. 268; Seaver v. Ransom, 224 N.Y. 233, 120 N.E. 639, 2 A.L.R. 1187, and Graybar Electric Co. v. Seaboard Surety Co., 157 Misc. 275, 283 N.Y.S. 522.

Lawrence v. Fox is a cause in which the promissor agreed out of his own funds to pay the promissee's debt to a third party. In the case at bar the Commercial Bank made no such agreement. Its undertaking as alleged was to facilitate the carrying out of the obligations of the municipalities to pay dollars in New York and to send such dollars out of Hungary to the agent of the municipalities in New York for the payment of the debt of the municipalities.

Graybar Electric Co. v. Seaboard Surety Co. involved a completion bond running to materialmen, and it was held that the promise was made to the beneficiary.

Certainly as against the National Bank of Hungary the doctrine of Lawrence v. Fox is not applicable. The most that can be spelled out of the affirmative obligation of that defendant as alleged in the complaint is that it should remit sums for semi-annual interest to Speyer & Co. in New York. The nature of such an obligation is discussed in Erb v. Banco di Napoli, 243 N. Y. 45, 152 N.E. 460, 50 A.L.R. 1009, where it was said: "The plaintiff has obtained a recovery upon the doctrine of Lawrence v. Fox, 20 N.Y. 268. As has been repeatedly stated, the fundamental fact in that case was the agreement made upon consideration to pay money received to a third party. We find no such agreement to pay contained in the agreed statement of facts in this case. Directions standing alone to a

148

bank or to an agent do not constitute an agreement by the bank or the agent for the benefit of a third party. * * * The facts as presented in the statement bring these lost coupons under the rule applicable to notes and checks to pay which money has been deposited with or sent to a bank. The holder cannot sue the bank. Baldwin's Bank v. Smith, 215 N.Y. 76, at page 82, 109 N.E. 138, L.R.A.1918F, 1089, Ann.Cas. 1917A, 500."

■ But, assuming that privity is made out as between the plaintiff and defendants, and this, it must be added, may seriously be doubted, at least as against the National Bank, an insuperable objection arises to the right of attachment for failure as to a showing of the plaintiff's damages.

Section 903 of the Civil Practice Act reads in part:

"§ 903. *What must be shown to procure warrant of attachment.* To entitle the plaintiff to such a warrant, he must show that a cause of action specified in the last section exists against the defendant, and, if the action is to recover damages for breach of contract, that the plaintiff is entitled to recover a stated sum."

■ It seems well settled that an affidavit in support of attachment, which states merely the same ultimate facts as are set forth in the complaint, without giving evidentiary facts tending to prove the causes of action, is insufficient, Abdun-Nur v. Arbeed, 198 App.Div. 795, 191 N.Y.S. 38, and the failure to furnish evidence in support of a warrant of attachment giving such evidentiary details as will enable the court to determine the value of the plaintiff's claim is fatal to the validity of the attachment, Wesley v. Drake, 240 App.Div. 59, 269 N.Y.S. 174. See, also, Penoyar v. Kelsey, 150 N.Y. 77, 44 N.E. 788, 34 L.R.A. 248, and Frusher v. Vacuum Dyeing Machine Co., 148 App.Div. 68, 131 N.Y.S. 994.

The statutory requirement has been considered and similarly rigidly interpreted in the federal courts. Auerbach v. Internationale Wolfram Lampen Aktien Gesellschaft (C.C.) 177 F. 458; Laughlin et al. v. Queen City Construction Co., Ltd. et al. (C.C.) 89 F. 482.

Applying the tests of the statute to the showing in the complaint and affidavit, we find merely that the plaintiff is the owner and holder of the 39 bonds in question. The plaintiff claims as his damages the difference between the par value of the bonds and their present market rate, $230 per one $1,000 bond. What he paid for the bonds does not appear nor when he purchased them. They may have been purchased after the default of the cities on January 1, 1932. Assuming, though, that they were purchased before that date, the bid price for bonds of the 1925 issue as far back as October 2, 1931, was but 23, and only 20¼ for the 1926 issue. It is difficult, therefore, to see how the breaches in 1932 could have been the proximate cause or contributing cause of the alleged damage sustained by the plaintiff.

■■ Another serious difficulty which the plaintiff encounters is occasioned by the proof that the functions of the two defendants were limited to acts capable of being performed only within the territorial limits of the Kingdom of Hungary. Only recently in Central Hanover Bank & Trust Co. v. Siemens & Halske (D.C.) 15 F. Supp. 927, 929, affirmed (C.C.A.) 84 F. (2d) 993, the general rule with respect to the law governing the performance of contracts was reiterated and it was there stated: "It is the law of the place of performance that controls matters relative to the legality of performance, impossibility of performance, and other excuses for nonperformance. New York Life Ins. v. Dodge, 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Zimmerman v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034; Louis-Dreyfus v. Paterson Steamships, 43 F.(2d) 824, 72 A.L.R. 242 (C.C.A.2); Ralli Bros. v. Compania Naviera (1920) 2 K.B. 287; Beale on Conflict of Laws, §§ 355-372."

From the affidavits in opposition it appears that the moratorium legislation in Hungary effective at the close of 1931 provided that amounts due on Hungarian bonds were not to be paid to foreign creditors, but required that the creditors make claim in Hungary. Criminal penalties were provided for violations of the moratorium legislation, and the failure by the defendants to remit in dollars is laid to the enactment of this legislation.

If the defendants had undertaken to perform their obligations in the United States, the foreign moratorium statute would not control. If this were an action against the Hungarian cities, the impossibility, illegality, or excuse relied on by the two banks would not avail, for, as Judge Patterson states in Central Hanover Bank

v. Siemens & Halske et al.: "The rule has frequently been laid down that impossibility due to change in foreign law is no excuse for breach of contract. Tweedie Trading Co. v. James P. McDonald Co., 114 F. 985 (D.C.N.Y.); Richards & Co. v. Wreschner, 174 App.Div. 484, 156 N.Y.S. 1054, 158 N.Y.S. 1129; Krulewitch v. National Importing & Trading Co., 195 App. Div. 544, 186 N.Y.S. 838; Jacobs v. Credit Lyonnais, 12 Q.B.Div. 589; Ashmore v. Cox, (1899) 1 Q.B. 436."

That principle of law, however, does not aid the plaintiff, for on the one hand the cities are not the defendants and on the other the defendants named undertook to perform their obligations not here but in Hungary.

For the foregoing reasons the motion to vacate the attachments made by the two defendants must be granted. However, since the plaintiff may desire to prosecute an appeal, and in view of the hardship which would be caused him in effecting service in the event that the Circuit Court of Appeals should entertain a different view from that expressed herein, the vacation of the warrant of attachment will be stayed pending a prompt prosecution of an appeal with leave to the defendants to move to vacate said suspension in the event that the appeal, if any, is not promptly proceeded with.

Settle order on notice.