### EGYES v. MAGYAR NEMZETI BANK et al.
### Civ. No. 1545.

District Court, E. D. New York.
May 14, 1947.

Seligsberg, Friedman & Berliner, of New York City, for plaintiff.

Reynolds, Richards & McCutcheon, of New York City, for defendant National Bank of Hungary.

Sullivan & Cromwell, of New York City, for defendant Cash Office for Foreign Credits.

GALSTON, District Judge.

The defendants move for summary judgment in this action in which the plaintiff, as the assignee of one Martin Lazar, alleges that he is the owner of certain interest coupons issued by the City of Budapest and a number of other municipalities of the Kingdom of Hungary (each one of which is hereinafter referred to as the "Obligor") and seeks to recover against the defendants, the National Bank of Hungary (hereinafter referred to as the "Bank") and the Cash Office for Foreign Credits (hereinafter referred to as the "Cash Office"), the sum of $99,925 with interest. The coupons were heretofore attached to bonds of the Obligor. Plaintiff complains that the Obligor failed to provide funds with its fiscal agent in New York for the payment thereof; but the defendants received monies in pengoes from the Obligor as the respective interest coupons fell due; that the pengoes (Hungarian currency) thus received by the defendants from the Obligor at first were in an amount equal to the dollar liability of the Obligor at the prevailing rate of exchange, then later at five per cent interest, though the coupons called for a higher rate.

After a recital of these general allegations, the complaint takes up first the claim against the City of Budapest. It is also set forth that the Bank is an Hungarian corporation, the stock of which is owned by private individuals; that the Cash Office for Foreign Credits is an agency, the work of which is performed by officers of the Bank.

The City of Budapest delivered its external Sinking Fund 6% Bonds, Loan of 1927, due June 1, 1962, in denominations of $1,000 and $500 each, with interest coupons maturing semi-annually, whereby the Obligor promised to pay the bearer upon the surrender of the coupon at the principal office of the Bankers Trust Company, New York City, the sum of $30 on the thousand dollar bonds, and $15 on the five hundred dollar bonds. It is alleged that all of the interest coupons owned by the plaintiff matured on various dates set forth in the complaint, and that the Obligor failed to provide funds for the payment of the plaintiff's coupons. It is the contention and allegation of the complaint that the Obligor, by making payments falling due under its obligations to the Bank, intended to be discharged from its obligations to pay the indebtedness to the holders of the said coupons, and that the defendants, upon the receipt of such monies, assumed the obligations of the Obligor to the holders of said coupons. Moreover, says the complaint, the Obligor had declared its intention not to pay or honor its obligations to coupon holders in the manner provided therein, and by such declaration waived the requirement that the coupons be presented for payment at the office of its fiscal agent in New York City; and that the coupons thus held, owned by the plaintiff, remained unpaid despite the fact that prior to the commencement of the action the assignor of the plaintiff duly demanded of the defendants payment of each of the coupons.

562

The other causes of action of the complaint in respect to the coupons held on obligations of other obligors, follow the tenor of the first cause of action involving the City of Budapest.

The motion for summary judgment is supported by affidavits of Viktor Bator, who was a lawyer in Hungary who had specialized in commercial and financial matters. He explains the decrees of the Hungarian government, No. 6900 of 1931, and No. 1960 of 1935, which are annexed to the affidavit of plaintiff's assignor in the attachment proceedings. Bator explains that the decree of 1935, among other things, prohibited Hungarian debtors from making payment abroad of coupons or sinking fund payments on bonds payable in United States dollars or any other foreign currency, with the exception of certain bonds of the Hungarian government itself. He also explains that the decree of 1935 created "a juridical person known as Cash Office for Foreign Credits", to be managed by the Bank; but never, by law or by decree or otherwise, had it been determined what shall be the ultimate disposition of the pengoes (Hungarian currency) deposited theretofore in the foreign creditors' funds and subsequently in the Cash Office. Before such necessary enacting legislation, World War II occurred, with the result that "the pengoes have become worthless, so that the ultimate disposition is no longer of any importance". He states, as is known, that by the Hungarian law, deposit of monies by debtors with the Bank or with the Cash Office for Foreign Credits under the moratorium decree, gave rise to no right on the part of holders of the bonds or coupons to receive payment of any of the monies deposited, and that before any such payment could arise, the law required a decision by the Bank that such payment or payments could be made without endangering the continuity of the country's economic life.

Also supporting the defendant's motion is the affidavit of Alexander Szasz. He is the economic adviser to the Hungarian Legation in Washington, and had been employed by the Bank for a period of fourteen years. He was in charge of all matters relating to the foreign debt service, including the management of the Cash Office of Foreign Credits, and its predecessor, the Foreign Creditors' Fund. He explains that the Bank is a stock corporation and is the central bank of Hungary, owned in part by the national government. He explains that the two decrees to which reference has been made are known as moratorium laws, and that pursuant to those laws, debtors of long term foreign currency bonds, including those described in the complaint, were forbidden to make payment of coupons abroad, and were required to make deposits of pengoes as the coupons became due at the Bank in order to get the benefit of the moratorium. The inhibitory purpose of the 1931 decree was considered in Mayer v. Hungarian Commercial Bank of Pest et al., D.C., 21 F.Supp. 144. Szasz stresses the point that the deposits by the debtors were to be made, and always were made, not in United States dollars, or in other foreign currency, but in pengoes. Explanation is afforded of the need of the moratorium laws as arising from the financial situation, both internationally and in Hungary, beginning in a period following soon after the stock market crash in the United States of 1929. It will not be necessary at this time to repeat in detail the explanation of the Hungarian government's financial difficulties as recited in the Szasz affidavit. He fully explains the necessity for the moratorium decree No. 6900 of 1931, and subsequent governmental acts. Szasz states that the Hungarian government, in 1931, first blocked or froze external short term obligations, and later, in December 1931, enacted decree No. 6900, which blocked all external long term obligations. The effect was that all amounts due from persons in Hungary to persons outside of Hungary were blocked or frozen, and no payments could lawfully be made without permission of the Bank. A duty was imposed on the Bank to permit transactions in foreign exchange only when in the opinion of the Bank such transactions could be executed without endangering the economic welfare of the Hungarian government. The affidavit recites that the Bank has never authorized or permitted the payment of United States dollars demanded in the complaint. However, in

1937, the Hungarian government and the Bank, in the belief that the country's economic situation had improved, enabled the Cash Office to make an offer to the bondholders to the effect that a reduced amount of interest would be paid in the original foreign exchange against surrender of the coupons. The effect was to give the coupon holders some payment owed them by the Obligor, and also had the effect of stabilizing the market on said coupons. This offer of 1937 was extended for one year from August 1, 1940, the date of its expiration. Then freezing orders of the United States government, and war conditions, made further payments impossible. Thus at the end of the war, the pengo became utterly worthless, and by law, in 1946, a new unit of currency, the forint, was established. Over a period of six months thereafter, pengoes could be exchanged for forints at the rate of four hundred thousand quadrillion pengoes to one forint. Thus the pengo is now worthless. Finally, it appears in the Szasz affidavit that the dollars of the Bank which were attached in this suit, were unrelated to the pengoes deposited by the Obligor in Hungary. It is asserted that plaintiff's attachment covers indiscriminately funds of the Bank in the Federal Reserve Bank of New York, and in several other New York banks. The funds were obtained from diversified sources, including payments made by persons in the United States for goods purchased in Hungary, remittances by persons here to relatives or friends in Hungary, and in general all dollars that came into the hands of the Bank.

■ Now as to the law of this case, there is no contention that there was an express agreement by defendants to pay the plaintiff or those similarly situated. There was no contract between the plaintiff (or other bond or coupon creditors) and the defendants or either of them. The action is not against the makers of the coupons. Moreover the duty of the defendants, whatever it may be, must be measured not merely by any agreements between the Obligor and the Bank, but also by the restrictions of the moratorium decrees. Thus the deposit of pengoes by the Obligor with the Bank, though it might well earmark those pengoes in Hungary, did not commit the Bank to the obligation of transferring funds in foreign exchange to foreign countries in which bonds of the Obligor were held. However much the deposit in Hungary of pengoes with the Bank may have created a lien on those funds for the benefit of coupon holders, there could be no such lien available to the plaintiff in New York, unless the dollars had been transferred to New York for the purpose of paying coupon holders what was due them. Also it seems entirely clear, in the light of the Hungarian moratorium statutes, that the Bank cannot be charged with the failure to convert pengoes into dollars and transfer them to New York.

■ It is the position of the defendants that no issue of fact remains to be tried. The plaintiff argues that proof of foreign law is itself an issue of fact, and that the interpretation to be placed upon foreign law requires a trial. Such a position would be tenable if it appeared that there was any dispute about the exact terms of the two moratorium statutes, or the interpretation thereof. Indeed, the decrees are offered by the plaintiff in the affidavit supporting the application for a warrant of attachment. The defendants accept the versions thus filed. There is then no dispute about the enactment of the law. Nor is there an issue in respect to interpretation, for there is none raised in the affidavits in opposition to this motion. The interpretation given to the moratorium statutes by defendants' experts, Szasz and Bator, are not contraverted. The fact that dollar payments were made to some coupon holders, as set forth in the Lazar affidavit, affords no interpretation of the Hungarian decrees unless those payments were under some general provision of Hungarian law. There is no such contention made in the answering affidavits, nor is there any evidence of payments made by the defendants except as described in the Szasz affidavit between 1937 and 1940. United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361, cited by the plaintiff, is hardly pertinent, for at most it holds that a construction *consistently* given a statute by an executive department charged with its enforcement, should be allowed great weight, and not be over-

thrown, unless a different construction is plainly required. Clearly the facts herein are far removed from any such set of circumstances. In sum, I conclude that the plaintiff's rights are against the Obligor, and not against these defendants, and there is no issue of fact in the case; not even is there a denial of the averments in Szasz's affidavits that the funds attached are not the funds of the Obligor.

Accordingly the motion for summary judgment is granted. Settle order on notice.