**EGYES v. MAGYAR NEMZETI BANK et al.**

No. 61, Docket 20728.

Circuit Court of Appeals, Second Circuit.

Jan. 9, 1948.

William E. Friedman, of New York City (Seligsberg, Friedman & Berliner and Leonard L. Berliner, all of New York City, on the brief), for plaintiff-appellant.

George H. Richards, of New York City (Reynolds, Richards & McCutcheon, Barclay Shaw, Sullivan & Cromwell, and Emery H. Sykes, all of New York City, on the brief), for defendants-appellees.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from a summary judgment granted in favor of the defendants, the National Bank of Hungary and the Cash Office for Foreign Credits (to use the English translations of defendants' names). The action was commenced in 1940 in the Supreme Court of the State of New York, Kings County, by the issuance of a warrant of attachment against the property of the defendants. On their motion it was removed to the district court below, after which the defendants filed their answers. The complaint alleges that plaintiff, as assignee, is the owner of certain interest coupons on bonds issued by four Hungarian corporations. The coupons were payable in dollars in New York. Plaintiff complains that the obligors on the bonds failed to provide funds with their fiscal agent in New York for the payment thereof. He further alleges that as the respective interest coupons fell due the obligors paid the defendants pengoes (the then currency of Hungary) at the prevailing rate of exchange and equal to an interest rate of 5 per cent on the bonds, although the coupons called for a higher rate. He then says that the obligors by making such payments to the defendant Bank intended to be discharged from their obligation to the holders of coupons and that defendants upon the receipt of such moneys assumed the obligations of the obligors to the holders. Al-

though due demand has been made, the defendants have refused payment and they still retain the moneys accepted and received by them from the obligors. Plaintiff seeks to recover against the defendants the sum of $99,925 with interest.

There is no dispute that the payment of pengoes to the defendants was in pursuance of the decrees of the Hungarian government, No. 6900 of 1931 and No. 1960 of 1935. The earlier decree provided that the issuers of Hungarian bonds were not to make remittances abroad on maturity, but were to deposit the amounts thereof in pengoes at the defendant Bank. During the time in which the decree was to be in force no proceedings could be brought against any debtor who had thus made pengo deposits. In so far as payments in foreign exchange could not be made "without endangering the continuity of the country's economic life or other vital interests," the Bank was to remit these pengo deposits to a special fund (Foreign Creditors' Fund). This fund was to be administered by the Bank in agreement with an "Economic Adviser" (nominated by the League of Nations) at the Bank. Under the later decree, No. 1960 of 1935, the Cash Office for Foreign Credits was created, and it succeeded the Foreign Creditors' Fund. Thereafter the deposits of pengoes pursuant to Decree No. 6900 of 1931 were made directly to the Cash Office. Plaintiff contends that he has a cause of action against the defendants for money had and received because under the above-described decrees the pengo payments made by the obligors were for the benefit of their creditors, one of whom is the plaintiff. Whether or not this contention is valid must be determined by the effect of the decrees. It is conceded that the defendants had made no express agreement to pay the plaintiff. There is no contract between the parties.

The motion for summary judgment is supported by the affidavits of Viktor Bator and Alexander Szasz. Bator, who was a lawyer in Hungary and who had specialized in commercial and financial matters, declares that the moratorium decrees gave no right to the holders of bonds or coupons to receive payment of any of the moneys deposited. He further states that the effect of the law is to require a decision by the Bank that such payments could be made "without endangering the continuity of the country's economic life or other vital interests." Indeed, such is the very language of the law. This is a condition precedent to any liability on the part of the defendants. In the absence of such a determination the bondholders had no right to receive payments from the Bank. Szasz, Economic Adviser to the Hungarian Legation in Washington, declares further that the Bank was to determine when payments could be made compatible with the economic well-being of Hungary and that the payments here demanded had never been authorized.

Now there is no dispute as to the exact terms of the moratorium statutes; nor does plaintiff deny that payments must be authorized by the Bank before liability of the defendants would arise. He nowhere contends that an action would lie against the defendants the moment they received pengo payments from the obligors. If there were no more than this, summary judgment would clearly be proper, since there would be lacking any dispute of facts. But plaintiff contends that the defendants had paid out of the deposit account to other foreign bond and coupon holders similarly situated "millions of dollars" in foreign exchange in redemption of interest coupons and bonds and that such payments constituted a determination by the defendants of the required condition, which, once made, entitled him to payment of his interest coupons in foreign exchange. And he asserts that these contentions present issues of fact requiring trial.

There does not appear to be any dispute that certain payments of the kind stated were made. The exact amount of such payments may be in dispute, but we do not deem the fact important. For the only question is as to the circumstances under which such payments were made; and plaintiff, who would in any event have the burden of showing how he planned to support his contentions, Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469, 472, 473, has disclosed these circumstances in the affidavits filed on his behalf. Up until July, 1937, a nonresident owning coupons in Hun-

gary was required to negotiate with the Bank the terms on which he could convert his pengoes into some foreign currency. And the Bank was obviously using funds (very likely in considerable amounts) to buy up these foreign-owned securities at low rates. In July, 1937, defendants made an offer to all nonresident coupon owners of 1¾ per cent in foreign exchange. The facts that this was not accepted by plaintiff or his predecessors in interest or that the pengoes are now entirely worthless are not material. Nor do we see how the transactions as asserted change the legal situation. The nature of these currency moratoria would seem to make natural attempts to reduce the total debt load by bargain counter purchases; at any rate, we find nothing in the Hungarian decrees to prevent such transactions. Even if illegal, or if they be taken as, so far forth, a determination that payment could properly be made without endangering the country's economic life, they can hardly be considered a like determination as to all existing obligations at face value. At most such an implied determination must be of the limited character of the payments themselves.

■ Plaintiff also stresses the unconscionable nature of the transactions, asserting that the defendants have retained pengo deposits which should go to the obligees. But there were always severe risks involved in an investment in foreign bonds; and in view of all that has happened in the world, it seems profitless to characterize the currency maneuvers of foreign governments as unconscionable. Be that as it may, we cannot give judgment against strangers to a contractual transaction on such a ground or on anything short of a showing of legal right. The situation would be quite otherwise if the action were against the original obligors. Here judgment could be given in an American court notwithstanding foreign currency decrees, as was held in a case plaintiff cites, Central Hanover Bank & Trust Co. v. Siemens & Halske Aktiengesellschaft, D.C.S.D.N.Y., 15 F.Supp. 927, affirmed 2 Cir., 84 F.2d 993, certiorari denied 299 U.S. 585, 57 S.Ct. 110, 81 L.Ed. 431. The difference in the two situations is obvious. Plaintiff also relies on certain decisions of trial or intermediate courts in New York against the Reichsbank and involving the German Devisen Laws.[1] The nature of the issues considered and the absence of any formal opinion from the Appellate Division leaves us in doubt as to just how far recovery upon the German bonds may be expected against that bank in the state courts. In any event the German laws appear to be sufficiently different to prevent the cases from being precedents here. For those laws substituted the Reichsbank as obligor, releasing the original obligors from all liability. But the Hungarian decrees scrupulously preserved the bondholders' rights against the original contracting parties, effective after the "expiry" of the decrees. And even the temporary ban against proceedings involving those parties was, as we have seen, binding only in Hungary. Central Hanover Bank & Trust Co. v. Siemens & Halske Aktiengesellschaft, supra.

Since, therefore, plaintiff has made no showing of liability on the part of these defendants, the summary judgment for them was correct.

Affirmed.

---

[1] Bures v. The Reichsbank, Sup.Ct., Levy, J., N.Y.L.J., Nov. 1, 1939, p. 1419, denial of a motion to vacate an attachment, affirmed without opinion 258 App. Div. 873, 16 N.Y.S.2d 1020; s. c., Sup. Ct., Collins, J., N.Y.L.J., Nov. 13, 1940, p. 1524, granting plaintiff's motion for summary judgment, reversed for trial without opinion 261 App.Div. 1067, 27 N.Y.S.2d 780; LaGosh v. The Reichsbank, Sup.Ct., Collins, J., N.Y.L.J., Nov. 25, 1939, p. 1794, denying a motion to dismiss the complaint for insufficiency, affirmed without opinion Bures and LaGosh v. The Reichsbank, 258 App.Div. 1038, 17 N.Y.S.2d 1004.