NAAMLOZE VENNOOTSCHAP SUIKER-FABRIEK "WONO–ASEH" v. CHASE NAT. BANK OF CITY OF NEW YORK et al.

United States District Court
S. D. New York.
April 8, 1953.

834

Parker, Chapin & Flattau, New York City, for plaintiff, S. M. Chapin and Alvin McK. Sylvester, New York City, of counsel.

Milbank, Tweed Hope .& Hadley, New York City, for Chase Nat. Bank of City of New York and Egger & Co. A. Donald MacKinnon and William E. Jackson, New York City, of counsel.

Abberley, Kooiman & Amon, New York City, for impleaded defendant. Peter J. Kooiman and Henry F. Werker, New York City, of counsel.

Sylvester & Harris, New York City, for Foreign Exchange Commission of Suriname Joel K. Mithers, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

On July 19, 1950, plaintiff brought this action in the Supreme Court of the State of New York, to regain possession of certain securities valued at $950,000 and a cash balance of approximately $108,000 held by the defendant Chase Bank in an account in the name of impleaded defendant Escomptobank, N. V. An order of interpleader was entered on August 7, 1950, in the Supreme Court, consented to by plaintiff, under which Chase Bank was directed to hold the securities to the credit of the action and was thereupon relieved of all further liability in respect thereof. The impleaded defendant filed its petition and bond for removal to this Court on October 27, 1950.

By order of this Court dated January 28, 1952, 12 F.R.D. 261, plaintiff was given leave to amend its complaint so as to add a second cause of action against defendant Chase Bank *in personam*, for an alleged failure to account for dividends and other income received from the said securities since June 1940. Defendant Chase Bank thereupon asserted a claim-over against impleaded defendant Escomptobank, N.V. in the event that it (Chase Bank) should be held liable on plaintiff's second cause of action. On plaintiff's motion, made during the course of the trial, the second cause of action was dismissed with prejudice and consequently the defendant's cross-claim was also dismissed.

It is not disputed that plaintiff at all material times was, and continues to be, the owner of the securities and cash, the subject of this action. The impleaded defendant Escomptobank claims the right to possession of the securities; intervenor, Foreign Exchange Institute of Indonesia, an agency of the Republic of Indonesia, supports the claim of Escomptobank; intervenor, Foreign Exchange Commission of Suriname, claims the right to possession of the securities by virtue of the foreign exchange enactments of Suriname.

The facts presented are complex and crucial, encompassing events which transpired in the hinterlands of Indonesia (formerly Netherlands Indies) and the more immediate surroundings of the Chase National Bank of New York. No precise precedent has been found although there has been considerable litigation in this field. Freutel, Exchange Control, Freezing Orders and the Conflict of Laws, 56 Harv.L. Rev. 30 (1942).

Plaintiff corporation was organized under the laws of the Netherlands East Indies on July 1, 1899, for a term of fifty years. There are four stockholders; its managing director, Charly G. G. von Freyburg, his mother, his brother, and his sister. Charly vonFreyburg and his mother resided in the Netherlands East Indies until 1946 and the two other stockholders have at all relevant times resided in Europe. The business of the corporation was the operation of its sugar factory at Probolinggo, Java, in the Netherlands Indies, at which place its principal office was maintained.

Impleaded defendant at all material times was, and still is, a corporation organized and existing under the laws of the former Netherlands Indies, since December 27, 1949, the Republic of Indonesia. It is engaged in the banking business there, and in the Netherlands.

Prior to 1939 the plaintiff corporation and its stockholders individually had securities and money, all of which were converted into securities of American companies. On May 2, 1939, Charly von Freyburg, who had come to New York, opened a custody account in the name of the plaintiff with the defendant Chase and deposited therein the securities, the subject matter of this action. The plaintiff executed the usual custody agreement with Chase [1] (Plaintiff's Exhibits 1 and 2) and the securities have at

---

[1]. Defendant, Egger & Co., is the nominee of Chase for the purpose of holding securities and no further reference will be made to it herein.

all times since May 2, 1939, been in the vaults of the Chase Bank in the City of New York.

On May 21, 1940, shortly after the occupation of the Netherlands by the German Armed Forces, the Governor General of the Netherlands Indies promulgated an ordinance (Defendant's Exhibit BB) effective May 22, 1940, known as the "Foreign Exchange Ordinance, 1940" which had the express object of "preventing injury to the country's foreign exchange position." The ordinance empowered the Governor General to promulgate, by Government decree, regulations concerning the recording, delivery, and other utilization in accordance with the purposes of the ordinance (Section 8) of *inter-alia*, domestic and foreign securities held by "residents"—which term included corporations domiciled or maintaining an office in the Netherlands Indies. Section 1, sub. 1(b).

The ordinance further provided that any such delivery or other utilization was to be effected against compensation "to be determined by, or on behalf of the Governor General." Section 8.

The ordinance further authorized the promulgation of rules concerning the acquisition and disposition of foreign securities by resident corporations. Section 9(a)(1).

The ordinance also created a Netherlands Indies Foreign Exchange Institute, with its principal office at Batavia, Java, and charged that body with the duty of making available any foreign exchange required for the maintenance of the national economy, and to promote the just and efficient utilization thereof. Section 15, subs. 1 and 2. Further, the ordinance created a Netherlands Indies Foreign Exchange Fund, for the account of which any such delivery, etc., was to take place. Section 18, subs. 1 and 3.

Sections 19 et seq. contain "penal provisions" providing for imprisonment and/or fine for violation of any regulations issued "by or pursuant to" the ordinance.

It is significant to note that agreements involving a violation of any regulations prescribed pursuant to the ordinance are declared null and void by Section 29.

On May 25, 1940, the Governor General issued a decree, effective in Java on May 27, 1940 (Defendant's Exhibit DD) to "execute (implement) the Foreign Exchange Ordinance." Section 6, sub. 3(b) of this decree directed "all persons being in the Netherlands Indies" to place securities held abroad, of which they had the power to dispose, in the custody of one of four named banking institutions—one of these being impleaded defendant herein. The method of accomplishing this in the case of impleaded defendant here was "to cause such securities * * * to be deposited for his" (read: their) "account in the name of one of the banking institutions named in subsection 1 with a correspondent of such banking institution abroad." Section 6, sub. 3(b).[2]

The Governor General's Decree of May 25, 1940, shortly afterwards was replaced by a similar decree promulgated July 4, 1940, and effective July 17, 1940 (Defendant's Exhibit BB). The later decree repeats the directions to residents as to delivery of their foreign securities (Section 7, sub. 1[b]), and the manner of such delivery, in virtually identical terms. Subsection 5 of Section 7 of the July 4th decree expressly empowers the Foreign Exchange Institute "to fix the point of time after which any securities delivered * * * in accordance with subsection 1 may be restored to the persons entitled thereto upon their request."

Section 9 of this decree authorizes the Governor General, and any person or body acting on his behalf to direct delivery of securities to the Foreign Exchange Fund and other "utilization" thereof "in accordance with the Foreign Exchange Ordinance, 1940."

---

2. Indicative of the required relinquishment of control (see 111 F.Supp. 840 infra) is the fact that the securities were to be placed with a correspondent of the banking institution and not of the owner. After the transfer the Chase Bank entered into a custodial agreement with the Escomptobank. That Chase was the former custodian of plaintiff is coincidental since another correspondent might have been selected by Escomptobank.

A few days prior to June 13, 1940, Mr. von Freyburg discussed with a Mr. Pino, an agent of the Escomptobank, in Sourabaya, Netherlands Indies, the transfer of a Wono-Aseh account from another local banking institution, with which he was dissatisfied, to the Escomptobank. Mr. von Freyburg stated that he was informed at that time by Mr. Pino that the ordinance and decree required that the custody account of Wono-Aseh with the Chase Bank be placed in the name of a Netherlands Indies Bank and it was then agreed that Wono-Aseh would transfer its account with Chase to the Escomptobank. To accomplish this result, on June 13, 1940, plaintiff mailed to the Escomptobank the following letter (Plaintiff's Exhibit 3) addressed to the Chase National Bank:

"I request you herewith to transfer all my holdings and credit balance to the credit of the account which you carry for the Nederlandsch Indische Escompto Maatschappij of Batavia (D.E.I.)

"I am giving you the above instruction to comply with a decree, issued by our Government, to the effect that residents here, who have accounts with banks outside our country, should transfer these accounts to the custody of one of the Netherlands Indian banks at their choice. The shares of course remain my property, the difference being that my name will for the time being disappear from your books.

"In future I will give my instructions as to their disposal to the agency of the aforementioned Bank in Sourabaya, who will pass them on to you in their own name of course."

This letter was sent to Escomptobank to be forwarded to Chase. With it plaintiff enclosed a covering letter addressed to Escomptobank's Sourabaya branch (Plaintiff's Exhibit 4), in which plaintiff referred to its letter to Chase as "written instructions * * * to transfer the shares of stock which are deposited with it in our name, together with the credit balances into the name of your banking institution," and reiterated that such transfer was being made "in pursuance of the provisions of the Foreign Exchange Ordinance, 1940."

The transfer of plaintiff's securities to impleaded defendant was finally accomplished, pursuant to U. S. Treasury License, on August 6, 1940—when plaintiff's account with Chase Bank was closed, and a Custodian Agreement covering the securities was executed between Chase and Escomptobank (Defendant's Exhibits U and W). Thereafter periodic statements were sent by Chase to Escomptobank and by Escomptobank to plaintiff (Defendant's Exhibits T-1 to T-3).

Subsequent to June 13, 1940, Mr. von Freyburg became concerned about the relinquishment of his control over these securities, which he realized was the consequence of the letter sent to Chase. There ensued considerable correspondence between plaintiff and Escompto (Plaintiff's Exhibits F-R). Mr. von Freyburg testified that without directly asking the Escompto agents whether he had lost control, for fear of an affirmative answer, he attempted to ascertain whether control was already out of his hands and further whether any scheme might be devised by which the foreign currency regulations might be evaded. He testified that after conversations with his bookkeeper (Mr. Havercamp) they believed they could evade the foreign currency regulations by a plan which they devised. In furtherance of this plan, he drafted what purported to be a letter, dated July 1, 1940 (Plaintiff's Exhibit 5) allegedly addressed to Chase, the contents of which are as follows:

"Afschrift concept (draft copy)
"Chase National Bank
            "New York
"Gentlemen,
    "I beg to refer to my letters of the ———— June last instructing you to transfer my holdings to the account of the Nederlandsch-Indische Escompto Maatschappij.

"I hope, I made it quite clear to you, that this transfer was not voluntary, but in consequence of a decree issued by the Government of The Netherlands East Indies. The measure however

does not in any way imply, that I lose control of my property, and I can dispose of the shares at will.

"As I myself like to be prepared in case of emergencies, I have been considering what would be the best course to take in case of foreign occupation of this territory. However remote, I must consider the possibility, in order not to be caught unprepared. Although I have an implicit faith in the foresight of my Government I am also anxious to take my own precautions to safeguard my property against seizure by unauthorized parties.

"I have therefore arranged with the Nederlandsch-Indische Escompto Maatschappij, that in case I wish to dispose of my shares that they cable the selling instructions to you (if so arranged with their own secret codeword) but that I will send at the same time a telegram to you confirming these instructions, using my own 'Key-words'. The object of this measure is obvious; my property cannot be touched without my consent.

"You will understand that this arrangement with the Nederlandsch-Indische Escompto Maatschappij could only be made, because I shall never mortgage any of the shares with them.

"The only cooperation I have to ask from you is, that, apart from any Government measures, either by your own or the Dutch East Indies Government, that you 'earmark' my property as it stood at the time of the transfer to the account of the Nederlandsch-Indische Escompto Maatschappij."

It is plaintiff's contention that this July 1, 1940 letter was actually sent to Chase, although Chase denied receipt of same.[3] Mr. von Freyburg testified that this letter was mailed directly to Chase and that a copy of the letter was also sent to Escomptobank. Mr. von Freyburg stated that he attempted to deceive the agents of the Escomptobank

into believing that he had not sent the letter directly to Chase although he urges upon this Court that he had done so. For this reason, he claimed, the July 1st letter, which he forwarded to Escomptobank, was headed "draft copy" and referred to by Mr. von Freyburg in another letter to Escomptobank of July 22, 1940 (Defendant's Exhibit N) as a "draft copy" written solely "to elaborate an idea". The same reason is offered to explain references in these letters to the fact that Escomptobank was to transmit the contents of the July 1, 1940 draft to Chase. Mr. von Freyburg stated that he realized Chase would thus receive double instructions but that this was all part of the subterfuge. He admits that he never received a reply from Chase to the July 1st letter. The Escomptobank took the position promptly that the scheme proposed in the July 1st draft would violate the foreign exchange regulations and so notified plaintiff. The contents of the letter were therefore never relayed to Chase by Escomptobank.

It is significant that at this time censorship of the mail was in force in the Netherlands East Indies, a further factor decreasing the likelihood that this letter embodying a scheme to evade the laws of that country, was ever mailed by von Freyburg, as he urges, to Chase. Whatever effect the July 1, 1940 letter might have had, if any, had it been transmitted as an official communication (as contrasted to a tentative draft) to either Chase or Escomptobank, I find that it was never mailed in any form to Chase and was sent to Escomptobank only "to elaborate an idea" of Mr. von Freyburg and to seek advice, not as an official directive of the plaintiff. It was a so-called "feeler", which failed to meet the success von Freyburg hoped it would and was rebuffed by Escomptobank and ultimately abandoned by von Freyburg as an "idea". It is apparent that von Freyburg was concerned that his communication of July 1, 1940 to Escomptobank might have resulted in his not being in compliance with the ordi-

3. All the records of the plaintiff were destroyed by the Japanese during the course of their occupation of the Netherlands East Indies. The letters offered in evidence by the plaintiff come from the files of the defendants. The copy of the July 1st letter comes from the files of the Escomptobank.

nance and decree for early in August, 1940 Mr. von Freyburg again wrote Escomptobank, this time asking if plaintiff was now in compliance with the foreign exchange regulations (Defendant's Exhibit O). Escomptobank consulted with the Foreign Exchange Institute of the Netherlands Indies, and relayed an affirmative response to plaintiff (Defendant's Exhibits P and P–2).

Early in 1942, pursuant to instructions from Dr. H. J. van Mook, Director of Economic Affairs and Chairman of the Commission of Supervision of the Foreign Exchange Institute, the account of the Escomptobank was transferred to the Netherlands Purchasing Commission, an agency of the Government-in-Exile of the Kingdom of the Netherlands. Dr. van Mook, in directing such transfer, acted under the authority of the foreign exchange laws of the Netherlands Indies and was empowered by section 2 of the resolution of the Governor General of May 27, 1940 (Staatsblad 228) to require that such acts be taken.

The purpose of this transfer was to prevent these assets from falling into the hands of the Japanese, whose invasion of the Netherlands Indies was correctly deemed imminent.[4] Securities so transferred to an account in the name of the Netherlands Purchasing Commission were to be administered by the latter as "Trustee" and to be returned intact at the end of a then indefinite period to the previous holders.

On October 14, 1947, the securities were re-transferred to the account of the impleaded defendant (Defendant's Exhibits Y, Z and AA). Such re-transfer was directed by the Netherlands Purchasing Commission upon instructions received from the Foreign Exchange Institute. It is conceded that plaintiff had no knowledge of the transfer to and from the Netherlands Purchasing Commission until the commencement of this action.

In March, 1942, von Freyburg and his mother were captured by the Japanese and imprisoned by them until September 5, 1945. Thereafter, early in October, 1945, von Freyburg was arrested and incarcerated by Indonesian insurgents who had already proclaimed their independence of the Kingdom of the Netherlands. He was imprisoned until about June 1946 when he was released, banished, as he says, from Indonesia, and advised that neither he nor the plaintiff would ever be permitted to return to Indonesia or to do business there. Mr. von Freyburg and his mother, the sole remaining stockholders then in Indonesia, were deported to Holland on August 4, 1946. The corporation, he says, did no business in Indonesia subsequent to March 1942.

Neither plaintiff nor any of its stockholders, all of whom remained Dutch nationals, ever "recognized the sovereignty of Indonesia" either prior to or subsequent to the date of the formal declaration of sovereignty, December 27, 1949. The Republic of Indonesia was recognized by our Government on December 28, 1949. See Department of State Bulletin, January 1, 1950, p. 55.[5]

Plaintiff attempted to effect a de facto transfer of its corporate seat to Suriname, a territory of the Kingdom of the Netherlands, in August, 1950 (subsequent to the commencement of this litigation). The corporation is there said by plaintiff to be in the process of liquidation. The Governor of Suriname approved the transfer of the domicile to that jurisdiction by approval of

4. On or about March 9, 1942, some few months after the transfer by Escomptobank of the account to the Netherlands Purchasing Commission the Netherlands Government-in-Exile promulgated Decree C–18. The purpose and provisions of this Decree were identical with those of the A–1 Decree of the Archimedes case, State of the Netherlands v. Federal Reserve Bank of New York, and Archimedes, 2 Cir., 201 F.2d 455, with the sole exception that C–18 nationalized the property of those Dutch citizens resident in the Netherlands Indies rather than in the mother country. Although plaintiff at one time urged that the terms of C–18 served to restore the right of possession to the plaintiff, this contention appears to have been abandoned. It was without merit.

5. The Republic of Indonesia was admitted to the United Nations on September 28, 1950. It has applied for admission but is not yet a member of the International Monetary Fund.

the plaintiff's amended certificate of incorporation, September 1950 (Plaintiff's Exhibit 13), and accordingly plaintiff has been recognized as a Suriname corporation by its Governor General.

In June of 1950 plaintiff sought the release of its property at Chase, and in June and December 1950 Escomptobank, at plaintiff's request, applied for a license from the Foreign Exchange Institute of Indonesia to deliver the securities to plaintiff. Such request was denied[6] (Defendant's Exhibit S).

At the present time, the Escomptobank which has at all times recognized that ownership remains with the plaintiff, credits the account of Wono-Aseh in Indonesia with income received from the securities. Such credits are made in Indonesian Rupias. The plaintiff's account in Indonesia has been subjected to various measures adopted by the new nation in attempts to bolster its economy. One such measure resulted in the obligatory purchase of Indonesian Government bonds to the extent of one-half of the account. This measure applied to all account balances in Indonesia and was not discriminatory against those in plaintiff's position. Plaintiff urges that these bonds have no market value outside of Indonesia and are currently being redeemed by the Indonesian Government at the rate of 40% of their face value. Other regulations of the Indonesian Government in effect block plaintiff's account in Indonesia so that plaintiff may not remove the funds from Indonesia.[7]

▇▇▇▇ Plaintiff to recover in this possessory action, must establish more than its beneficial ownership, which is conceded. It must establish its right to immediate possession of the securities. Pollock, Law of Torts, 12th Ed. 1923, p. 346. To establish such right to immediate possession, plaintiff contends that the transfer effected by the June 13, 1940 letter to Chase became revocable without the consent of the Escomptobank, subsequent to the departure from Indonesia of the corporation and its stockholders. Plaintiff's authority for this principle, it is urged, is the fact that the transfer effective by the June 13th letter is to be governed by the law of New York, the situs of the property. Restatement of Conflicts, Section 258. Direction der Disconto-Gesellschaft v. U. S. Steel Corp., 1925, 267 U. S. 22, 28, 45 S.Ct. 207, 69 L.Ed. 495; Hutchison v. Ross, 1933, 262 N.Y. 381, 390, 187 N. E. 65, 89 A.L.R. 1007. Both under New York and Netherlands Indies conflicts of law, the latter as established by undisputed expert testimony, would the laws of the situs of the property govern the right of revocation of any interest conveyed. Since New York law governs, and demand is made for a return of the securities in New York, any impediment to such return created by Indonesian law is said to be irrelevant for as Escomptobank has conceded, such laws were neither designed to have nor would the forum accord to them any extraterritorial effect. In re Liebl's Estate, Sur.1951, 106 N.Y.S.2d 715. The Escomptobank agreeing that New York law governs, asserts, however, that to establish the nature of the interest conveyed to Escomptobank in 1940, acting as an agency of the Foreign Exchange Institute, and selected by plaintiff itself as one of four such banking institutions, to act in this capacity with respect to the Wono-Aseh account, the Court must (according to New York law) look to the intent of the plaintiff and therefore to the requirements of the Foreign Exchange Ordinance with which plaintiff sought to comply. Zivnostenska Bank National Corporation v. Frankman (1950) Appeal Cases 57; Cf. Shannon v. Irving Trust Co., 275 N.Y. 95, 102, 9 N.E.2d 792; Kahler v. Midland Bank Ld., (1950) Appeal Cases 24, 28.

It is clear and has been amply established by the expert testimony of Professor Kisch,

---

6. Escomptobank at the direction of the Indonesian Foreign Exchange Institute has instructed Chase to transmit the securities to Indonesia (Defendant's Exhibit S), but this action has been prevented by restraining order obtained by plaintiff in this action.

7. Plaintiff, however, employs an agent in Indonesia who regularly reports on the condition of plaintiff's property there, and who is paid out of plaintiff's accounts in that country.

called by the impleaded defendant Escomptobank, that under Dutch law the Foreign Exchange decrees required a complete divestment of control over the securities by the transferor and gave to the designated banking institution great power over the securities to be exercised for the benefit of the national economy. It is also clear that whatever reluctance Mr. von Freyburg may have had about the loss of control over these securities, his basic intent was to comply with the Foreign Exchange Decrees rather than to subject himself to their penal provisions. He preferred to comply with the decrees and still retain control if it could be done, but if doing the latter meant that he was not in compliance and therefore subject to penalties, it is quite clear that his choice was full and absolute compliance no matter how distasteful and even at the cost of loss of control.[8] Compare Plesch v. Banque Nationale De La Republique D'Haiti, 1st Dept.1948, 273 App.Div. 224, 77 N.Y.S.2d 43, affirmed 298 N.Y. 573, 81 N.E.2d 106 (Depositor notified bank not to send securities to Haiti where subject to confiscation). In the August 1940 correspondence Mr. von Freyburg unequivocally demonstrated his desire to be in compliance with these regulations.

Defendant assumes the lack of extraterritorial effect of the foreign exchange regulations and recognizes that if plaintiff had successfully ignored the directive to transfer the account a New York court would acknowledge plaintiff's right to immediate possession. But defendant maintains that the New York court is not free to ignore the transfer effected by plaintiff's own act in directing that such transfer be made.

■ It is one thing to deny extraterritorial effect to a foreign statute; it is another thing to treat the statute as a nullity. Plaintiff contends that it would be a distortion of the language of the letter of June 13th to construe it as an agreement on plaintiff's part "irrevocably to part with control without regard to exchange control laws"

(Brief of plaintiff, p. 7). But the Court cannot ignore completely the existence of these control laws especially since the June 13th letter specifically states that the instructions are given to comply with such laws. As was said in Canada Southern Railroad Co. v. Gebhard, 1883, 109 U.S. 527, 536, 3 S.Ct. 363, 369:

"That the laws of a country have no extraterritorial force is an axiom of international jurisprudence, but things done in one country under the authority of law may be of binding effect in another country."

See also Bernstein v. Van Heyghen Freres Society Anonyme, 2 Cir., 1947, 163 F.2d 246, certiorari denied 1947, 332 U.S. 772, 68 S. Ct. 88, 92 L.Ed. 357.

■ While this Court will not afford extraterritorial effect to the ordinance and decrees discussed, it must look to them in order to ascertain what plaintiff intended to accomplish by its transfer of possession to Escomptobank.

I conclude that this Court may not ignore plaintiff's own act but must examine the consequences which Mr. von Freyburg intended his letter of June 13th to have in order to determine what interests, if any, were conveyed therein. In so doing, this Court is not giving extraterritorial effect to the foreign exchange ordinances. The situation is analogous to that presented in the case of Deschenes v. Tallman, 1928, 248 N. Y. 33, 161 N.E. 321. There Judge Cardozo, recognizing that a judgment of a foreign court did not, of its own force, transfer the title to land located in this state, held that the result is different where the conveyance is executed by the owner, though he act under compulsion. Contrast Compania Espanola De Navegacion Martima, S. A. v. The Navemar, 303 U.S. 68, 75 (1938) (in invitum transfer not recognized where no act of possession on behalf of government).

As was said in the Deschenes case:

"The conveyance, and not the judgment, is then the source of title. As to

8. It should be noted that Section 29 of the Ordinance voids any agreements violative of the regulations. Although no extraterritorial effect is to be accorded to

this provision, it is clearly relevant with regard to Mr. von Freyburg's actual intent in Indonesia.

this the law has been undoubted since Penn v. Lord Baltimore (1 Ves.Sr. 444). The distinction is between a judgment directed against the res itself, and one directed against the person of the owner, who acts upon the res. His deed transmits the title irrespective of the pressure exerted on his will." 248 N.Y. 33, 37, 161 N.E. 321, 322.

So in the instant case, it is the letter of June 13, 1940, and plaintiff's act in transmitting it, and not the Foreign Exchange Ordinance itself which effected the transfer of the account, and it is of no avail to the plaintiff that the letter was written under the "compulsion" of the ordinance.[9]

. After the Chase Bank, pursuant to the instructions it received from plaintiff, transferred the account to Escomptobank, an interest was created in the latter which, it must be emphasized, it was to exercise for the benefit not only of the plaintiff but for the government as well.

The next inquiry must be whether that interest, which by the terms of the Foreign Exchange Ordinance, was to be irrevocable without the consent of the Escomptobank (which must in turn obtain the consent of the Foreign Exchange Institute of Indonesia) may in fact be revoked, without such consent, by virtue of subsequent happenings.

It is the contention of the plaintiff that the removal of the corporation and its stockholders from Indonesia and the transfer of the corporate seat to Suriname deprived the Indonesian Government of any interest it might have had in or any control over the securities.

On April 26, 1940, the Dutch Government acting, as stated in the preamble of the statute, because of the then existing extraordinary circumstances, promulgated a law (Plaintiff's Exhibit 12) designed to facilitate transfer of corporate seats from one part of the Netherlands to another. This was another measure designed to prevent assets in areas overridden by an enemy

from being taken from their Dutch owners. It was ostensibly pursuant to the authority of this statute that the Governor General of Suriname acted in recognizing the plaintiff as being a Suriname corporation. On the validity of this transfer of corporate seat also rests the claim of the Foreign Exchange Institute of Suriname which, asserting that plaintiff is subject to Suriname law, including that country's currency regulations, asserts that it has the right to possession of these securities. To so hold, would, of course, accord extraterritorial effect to the Suriname currency regulations, but the resolution of other issues in this case makes it unnecessary to decide the incongruous contention that such extraterritorial effect might be given to the Suriname but not to the Indonesian currency regulations.

As an expert witness on the effect of the attempted transfer of corporate domicile to Suriname plaintiff called Mr. Hans Smit. Although he concluded that the transfer to Suriname was valid, he acknowledged that the April 26, 1940 law was designed to allow transfer from one part of the Netherlands to another part of the Netherlands and that at the time of the attempted removal to Suriname, the Republic of Indonesia was not a part of the Netherlands. Plaintiff urges, however, that the corporate transfer law not having been revoked in Indonesia by the new sovereign, the private laws of that country remain in effect until repealed. Vilas v. City of Manila, 1911, 220 U.S. 345, 31 S.Ct. 416, 55 L.Ed. 491. However, by virtue of an agreement between the Netherlands Government and Indonesia, it is agreed that Netherlands law remains applicable in Indonesia only to the extent that it is not inconsistent or incompatible with the transfer of sovereignty to Indonesia. *Transitional Regulations,* Section 8. It is the conclusion of this Court that the April 26, 1940 corporate transfer law is inconsistent with the sovereignty of Indonesia, and nothing bolsters that conclusion more than the facts in the instant case.

---

**9.** Similarly in the Deschenes case it was of no consequence that the conveyance was executed under the compulsion of the judgment of the foreign court. The compulsion of a valid statute does not, in any event, constitute duress. Williston on Contracts (Rev.Ed.) § 1606; Restatement of Contracts, § 493.

Plaintiff's corporate existence and powers are governed by the law of the country of its incorporation. *Restatement, Conflict of Laws,* Section 157, 158, 159. Before the purported change of corporate seat in 1950, the plaintiff corporation was subject to the jurisdiction of the Republic of Indonesia and by means of currency regulations designed, not for plaintiff's benefit but to sustain the foreign exchange position of the Government, control was being exercised over the assets of plaintiff in New York. In August 1950 [10] (after the commencement of this litigation), in which the interest of the Republic of Indonesia, represented by its agent, the Foreign Exchange Institute of Indonesia, became quite apparent, plaintiff endeavored to remove itself entirely from the jurisdiction of Indonesia by the purported transfer of corporate domicile; this without the consent of the Indonesian Government, which has not to the present time recognized the supposed transfer of seat to Suriname. Were the law of April 26, 1940 construed as permitting this, it would be effective in depriving the Republic of Indonesia, without its consent, of control it had already exercised over assets and the continuation of which it apparently deems necessary to the welfare of its national economy. Certainly to this extent, therefore, the use which plaintiff seeks to make of the April 1940 law is indeed inconsistent with the sovereignty of the Republic of Indonesia. I conclude, therefore, that the April 26, 1940 Netherlands law did not continue in force in Indonesia after that country became a sovereign nation, in August 1949.

Assuming the April 26, 1940 act were otherwise applicable, there would be other reasons for declaring it unavailable to plaintiff as authority for the purported transfer of seat. Its preamble states it was to be effective only under the then existing extraordinary circumstances. As Professor Kisch and Dr. von Saher, another expert on Dutch and Netherlands Indies law, testified, the then contemplated circumstances were "war circumstances", i. e. the war with Germany and the then imminent war with Japan, and not those presented by the state of affairs in Indonesia in August of 1950, when the attempted transfer of corporate seat took place. I am, therefore, of the opinion that the statute urged upon this Court was inapplicable to the plaintiff corporation and gave to it no power to effect a de jure transfer of corporate seat, without the consent of the Indonesian Government.

In support of its contention that plaintiff is now a Suriname corporation and that this cannot be questioned plaintiff urges that the approval by the Governor of Suriname of the amendment to the certificate of incorporation by which the transfer was to be effected was an administrative act of an official of a foreign government which should be accorded recognition by the courts of the forum. Oetjen v. Central Leather Co., 1915, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Banco de Espana v. Federal Reserve Bank, 2 Cir., 1940, 114 F. 2d 438. But while this proposition will support the contention that plaintiff is a Suriname corporation for some purposes— as for instance to establish its capacity as a Suriname corporation to maintain this action, Cf. Chemacid S. A. v. Ferrotar Corp., D.C.S.D.N.Y.1943, 51 F.Supp. 756, 759—it does not follow that for all purposes would its present corporate domicile in Suriname govern the ruling of the forum. Mr. Smit, Dr. von Saher and Professor Kisch have all testified that such a transfer of seat or loss of corporate existence in Indonesia could have no effect on conveyances already completed. The transfer of seat could not undo that which has been done. I have previously found that the June 13, 1940 letter and subsequent letters served to transfer an interest and control over the securities to the Netherlands Indies Government, succeeded by the Indonesian Government, acting through its agent, the Escomptobank. No unilateral act by the plaintiff of the sort here in question can serve to invalidate that transfer.

10. Plaintiff's witness, Hans Smit, testified that the expiration of the corporate charter in 1949 has no bearing on this problem since under Dutch law the corporate manager may continue to act after that expiration in furtherance of the liquidation of the corporation.

An individual or a corporation may remove itself or even be banished from a country but that removal will not nullify acts already completed prior to such removal.

■ Plaintiff has also urged that the transfer of the account to the Netherlands Purchasing Commission in 1942 was an unauthorized act which terminated the bailment to the Escomptobank and restored to plaintiff the right to immediate possession. These transfers bore a merely formal character and were designed to protect the *res* from enemy control.[11] The Netherlands Purchasing Commission acted as a trustee and in October 1947 did in fact return the securities intact to their former status. Assuming it was unauthorized, it is difficult to see how plaintiff has been injured by this transfer. Indeed this transfer was for the benefit of plaintiff and the protection of its property. Furthermore, the transfer in 1942 and the re-transfer in 1947 were fully authorized under the laws of the Netherlands Indies and were, moreover, perfected after consultation by Dutch Government officials with officials of our own Government. It is not for this Court to inquire into the legality of acts taken by the Netherlands Indies Government for the protection of its citizens. Cf. Bernstein v. Van Heyghen Freres S. A., 2 Cir., 1947, 163 F.2d 246, 249, certiorari denied 1947, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357.

■ ■ Of course, where the bailee effects a transfer which is repugnant to or may be said to be an absolute disclaimer of the original bailment, such bailment terminates and the right to immediate possession is restored to the bailor. But the interests created by the letter of June 13, 1940 were not those of a bailment in which the sole interest remained with the bailor. This was not the usual bailor-bailee relationship. While there is no denial of the proposition that plaintiff has at all times remained the beneficial owner of these securities, such ownership became encumbered by an interest created first in the Netherlands Indies Government and then in the Indonesian Government as a result of plaintiff's act appointing Escomptobank in compliance with the decrees and ordinances. Were it not for this interest the bailment might, indeed, be terminable at the will of the bailor under both Dutch and New York law. See Netherlands Indies Civil Code, Section 1725; Williston on Contracts, Section 1039. But the very purpose for which the foreign exchange ordinances were passed was to create such an interest in the Netherlands Indies Government. There has been expert testimony to the effect that unlike the Decrees A-1 or its Netherlands Indies counterpart C-18, the foreign exchange ordinances were not enacted for the benefit or protection of the Dutch property owner but rather were designed to protect the national economy. Compare State of the Netherlands v. Federal Reserve Bank of New York and Archimedes, 2 Cir., 201 F.2d 455. It was for this reason that under the ordinance and decrees a great degree of control over securities transferred was given to the foreign Exchange Institute, and surely this control included the power to transfer the account to an agency of the Netherlands Government where such transfer was for the purpose of keeping the securities from falling into the hands of the enemy.

It has been urged that this Court consider the manner in which the foreign exchange ordinances are being administered by the new sovereign. There is also submitted for my consideration the averment that the coming into being of such a new sovereign ipso facto has the consequence of making the transfer revocable.

The agreement between the Kingdom of the Netherlands and the Republic of Indonesia which recognized the sovereignty of the latter, provided for the continuation in Indonesia of Dutch law to the extent that such law was not inconsistent with the transfer of sovereignty. It is significant that all of the various foreign exchange ordinances and decrees which sought to place control over foreign assets in the Government were enacted in 1940 by the predecessor sovereign. The Indonesian

11. The Japanese invasion was imminent.

Government has chosen to continue them in force and the Foreign Exchange Institute of the Netherlands Indies has now been replaced by the Foreign Exchange Institute of Indonesia.

Plaintiff contends that under Indonesian rule there exists a policy of discrimination against Dutch nationals and that in furtherance of this policy the foreign exchange ordinances are being administered in such a manner as to be confiscatory. Plaintiff emphasizes that neither the corporation nor any of its stockholders have recognized the sovereignty of the Republic of Indonesia and urges that there is, therefore, no power in that sovereign to exercise control over property in New York of former residents. Cf. United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 1943, 137 F.2d 898 (individuals fleeing invader may elect new nationality or remain stateless).

It is significant to note that plaintiff does not contend that these very same foreign exchange ordinances and decrees, when enacted, or as administered by the Netherlands Indies Government were discriminatory or confiscatory. (It is agreed by all parties that they were to have no extraterritorial effect and so this Court is not called upon to determine whether even as administered by the Dutch they fall into that category of foreign statute to which the forum would deny extraterritoriality.)

■ The sovereignty of the Republic of Indonesia has been recognized by the Kingdom of the Netherlands and the status of that new country with respect to Dutch residents and to the continuation of Dutch laws is affected by the terms of the agreement recognizing such sovereignty. The attention of this Court has not been directed to any provision in such agreement which would serve to deprive the Indonesian Government over any power exercised by the former sovereign with respect to the matters here in question. Under that agreement, as has been noted previously, Dutch law and hence the rights and powers which that law gave to the Government continued in force unless incompatible with the transfer of sovereignty. The sovereignty of Indonesia has been recognized in both the Netherlands and the United States.[12] The control exercised here is not that of the de facto government of an invader. The Republic of Indonesia is a de jure government and entitled to the recognition accorded such governments. Contrast Chemacid S. A. v. Ferrotar Corp., supra.

■ Had the Netherlands Indies Government acting under foreign exchange ordinances provided that income received on foreign securities would be credited to the account of the beneficial owner in local currency rather than dollars, it would have been acting within its power. In crediting the account of plaintiff in Indonesia with income from these securities not in dollars, but in Indonesian Rupias, the Republic of Indonesia is acting in a similar manner. Control of the national currency and of foreign exchange is a necessary attribute of sovereignty.[13] Ling Su Fan v. United States, 1910, 218 U.S. 302, 310, 31 S.Ct. 21, 54 L.Ed. 1049. The obligatory purchase of government bonds with half of plaintiff's account balance in Indonesia is an act of a foreign government done within its own territory having no necessary relation to the foreign exchange control law. Our courts have consistently refused to pass on such acts.

It is the fundamental premise of this decision that plaintiff by its own act, albeit under the direction of an ordinance and decree, admittedly valid in the Netherlands Indies, conveyed to the Escomptobank, acting as a Government agency, control and possession over these securities. By virtue

---

12. See footnote 5, supra.

13. The Court of Appeals for the Second Circuit has recently observed that "in view of all that has happened in the world, it seems profitless to characterize the currency maneuvers of foreign governments as unconscionable." Egyes v. Magyar Nemzeti Bank, 2 Cir., 1948, 165 F.2d 539, 541. In Hughes Tool Co. v. United Artists Corp., 1st Dept. 1952, 279 App.Div. 417, 110 N.Y.S.2d 383, 387, it was observed that foreign governments cannot in many cases remove currency restrictions "except at the expense of national survival."

846

of an agreement between the Kingdom of the Netherlands and the Republic of Indonesia that control is now being exercised by the latter sovereign.

An American Court will not recognize a foreign statute which is confiscatory or otherwise against the public policy of the forum as effecting, of its own force, a transfer of property situated in this country. See Seidl-Hohenvelden, Extraterritorial Effects of Confiscations and Expropriations, 49 Michigan L.Rev. 851 (1951). But I know of no authority for the proposition that an interest already conveyed to the sovereign will be restored to the transferor because the sovereign sees fit to exercise the power created by such an interest in a manner which might offend the public policy of the forum.[14]

Accordingly, judgment is hereby directed to the impleaded defendant, Escomptobank, dismissing the complaint, and defendant Chase will be directed to hold the securities and cash balance to the order of the Escomptobank which will continue to exercise control over the account in the same manner as heretofore.

14. This Court is not intimating by this statement that our public policy is being offended.